UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

         Plaintiff,

  v.

GAYLORD LINCOLN individually and
D/B/A LINCOLN FARMS; and G. LINCOLN
FARMS, LLC,

         Defendants.

_____/

Case No.

Hon.
U.S. District Court Judge

## COMPLAINT

The United States of America, by its counsel, Andrew B. Birge, United States

Attorney for the Western District of Michigan, and Andrew J. Hull, Assistant United

States Attorney, states the following as its Complaint against the Defendants:

### I. INTRODUCTION

1.    Defendant Gaylord Lincoln financed a network of straw lessees—each

of whom, at Lincoln's direction, knowingly and falsely claimed to be a "producer" who

was independently eligible for federal benefits—to circumvent strict limits on U.S.

Department of Agriculture ("USDA") annual benefit payments.

2.    To do so, Lincoln parsed his substantial farmland holdings to a group of

straw operators who, at Lincoln's direction, knowingly submitted false and

fraudulent documents to enroll in USDA programs.  By falsely claiming Lincoln's

crops as their own, these straw lessees fraudulently obtained USDA benefit payments that they funneled to Lincoln for his personal benefit.

3.     Lincoln also directed his network of straw farming operators to falsify documents and fraudulently obtain crop insurance policies that were partially subsidized by the federal government.

4.     Through this crop insurance scheme, and in addition to the FSA benefit payment scheme described above, Lincoln fraudulently obtained (1) the benefit of insurance premium proceeds funded by the federal government, and (2) federal crop insurance indemnity payments to which he was not entitled.

5.     These schemes—the benefit payment scheme and the crop insurance scheme—are detailed more fully below.

6.     This action is brought by the United States of America to recover this money—and the statutory treble multiplier and civil penalties—under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and to recover all available damages for common law fraud and unjust enrichment.

## II. JURISDICTION AND VENUE

7.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, 1355(a), and 1367(a).  The Court may exercise personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a).

8.     Venue is proper in the Western District of Michigan pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because the Defendants transacted business in this District, including farming operations in Calhoun, Eaton, and Ingham

Counties, and because the Defendants committed acts in violation of 31 U.S.C. § 3729 within this District.

## III. THE PARTIES

9.     Plaintiff, the United States of America ("United States" or "Government") brings this action on behalf of its agencies, the Farm Service Agency, United States Department of Agriculture ("FSA"), and the Risk Management Agency, United States Department of Agriculture ("RMA").  FSA and RMA are agencies and instrumentalities of the United States, and their activities, operations, and contracts are paid from federal funds.

10.    Defendant *Gaylord "Butch" D. Lincoln* ("Gaylord Lincoln") is a resident of Springport, Michigan, in Jackson County.  Throughout the relevant time period, Gaylord Lincoln operated his farm under the assumed or fictitious trade name "Lincoln Farms."  At relevant times, Gaylord Lincoln's farming operations included farmland in Calhoun County, Eaton County, and Ingham County in the Western District of Michigan and in Jackson County.

11.    Defendant *G. Lincoln Farms, LLC*, is a Michigan domestic limited liability company located at 9221 North Parma Road, Springport, Michigan 49284. G. Lincoln Farms, LLC, was organized on January 16, 2013, with Gaylord Lincoln as its owner and resident agent.

## IV. THE FALSE CLAIMS ACT

12.    The False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides for the award of treble damages and civil penalties for, among other things, knowingly

3

causing the submission of false or fraudulent claims for payment to the United States Government.

13.    The FCA provides, in pertinent part:

(a) LIABILITY FOR CERTAIN ACTS.—

(1) IN GENERAL.—Subject to paragraph (2), any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

. . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

* * *

(b) DEFINITIONS.—For purposes of this section—

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud . . . .

31 U.S.C. § 3729.

14. The FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986), *available at* 1986 U.S.C.C.A.N. 5266.

15. First, a defendant violates the FCA when the defendant "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Under the FCA, a claim includes a request for money. *Id*. § 3729(b)(2). Further, a claim is "false or fraudulent" under the FCA if the entity or person submitting the claim was not entitled to payment.

16. Second, a defendant violates the FCA when the defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

17. Third, a defendant violates the FCA when the defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

## V. FACTS

### A. Farm Service Agency Benefit Programs

18. At all relevant times, the U.S. Department of Agriculture's Farm Service Agency ("FSA") administered farm programs that provide benefits in the form of cash payments to eligible recipients. These programs were put in place to protect the economic stability of the country's agricultural system.

5

19.     More specifically, these programs provided benefits to assist the nation's farmers by minimizing the risks that come when a farmer's livelihood is tied to the production of crops.  Crop production can drastically fluctuate in any given year.  A good mixture of sun and rain coupled with a high demand for the grain can generate a "bumper" crop year for the farmer.  A bad storm, drought, insect invasion, or a reduced demand can devastate a farmer—many of whom live crop year to crop year—in just one year, forcing the farmer to abandon the venture altogether.  Federal benefit programs helped reduce the risk and uncertainty facing farmers, ensuring a strong agricultural system for the national welfare.

20.     These program benefits were designed to be as accessible to farmers as possible.  To that end, enrollment in these benefit programs typically involved a self-certification process, relying on the farmer to provide truthful and complete representations to the programs for the farmer to obtain, and the program to provide, the federal benefits.

### 1.     *Direct and Counter-Cyclical Program*

21.     Congress established the Direct and Counter-Cyclical Program ("DCP") when it passed the Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171.  The DCP awarded benefit payments to enrolled farmers based, in part, on a farmer's farming acreage in a given county as well as the commodity or crop produced.

22.     Payments under the DCP were made from the United States through FSA and the Commodity Credit Corporation ("CCC"), an instrumentality of the

United States, provided that the recipient qualified under the relevant regulations for participation in the program.

23.     To enroll farmland for participation in the DCP, a farmer was required to truthfully complete and sign a Form CCC-509.

24.     When completing and signing the Form CCC-509, the farmer agreed to abide by the terms and conditions of a program contract attached as an appendix to the form, hereafter referred to as the "DCP Contract."

25.     The terms of the DCP Contract reflected the program eligibility regulations promulgated by the USDA for FSA benefit program eligibility and codified in Title Seven of the Code of Federal Regulations, Part 718.

26.     The DCP Contract stated that only a "producer" is eligible to earn any payments under the DCP.  A producer, in turn, was defined as an owner, operator, landlord, tenant, or sharecropper who both (1) shares in the risk of producing a crop and (2) is entitled to share in the crop available for marketing from the farm or would have shared had the crop been produced.  *See* 7 C.F.R. § 718.2 (defining "producer").

27.     The DCP Contract further required each producer to file a farm operating plan with FSA for each crop year.  This farm operating plan was contained in a Form CCC-502.  The Form CCC-502 required the producer to list all tracts of land farmed by the producer.  The form required the producer to answer a series of questions regarding the farming operations on this land to determine whether the individual requesting benefits truly was a producer with an interest in the crop.  For example, the form required the producer to list the source(s) of capital, equipment,

custom services, labor, and management used in farming the land.  When the individual requesting benefits signed a Form CCC-502 and submitted it to FSA, the individual certified the following:

> I certify that all the information entered on this document and any supporting documentation is true and correct.  I understand furnishing incorrect information will result in forfeiture of payments and the assessment of a penalty.  I will timely provide written notification to the Farm Service Agency committees for the county and State listed on this form of any changes in this farming operation.

28.     Based on these certifications, FSA provided benefit payments to producers each crop year based on their enrollment in the DCP.

29.     Relevant to this matter, from 2010 to 2013, the DCP Contract restricted a person from receiving, directly or indirectly, DCP payments in excess of $40,000 per crop year as a producer.

30.     The DCP Contract contained the following warnings against, and penalties for, fraud.

a.     If FSA determined that a person erroneously represented any fact affecting a determination by FSA under the program contract, that person would not be allowed benefit payments.

b.     If FSA determined that the misrepresentation was intentional or fraudulent, or if the person knowingly adopted a scheme or device which tended to defeat the purposes of the program contract, that person would forfeit all rights to payment on each farm in which the person had an interest and the person would be required to refund to FSA all payments, plus interest.

8

c.  Such fraudulent conduct could also incur liability under various criminal and civil statutes, including 31 U.S.C. § 3729 (i.e., the False Claims Act).

### 2.  *Price Loss Coverage and County Agricultural Risk Coverage Programs*

31.  Congress eventually replaced the DCP and established the Price Loss Coverage ("PLC") and County Agricultural Risk Coverage ("ARC") programs when it passed the Agricultural Act of 2014, Pub. L. No. 113-79 ("2014 Farm Bill"), and continued them with passage of the Agriculture Improvement Act of 2018, Pub. L. No. 115-334) ("2018 Farm Bill").  Like the DCP, both the PLC and ARC programs calculated benefit payments, in part, on a farmer's farming acreage in a given county as well as the commodity or crop produced.

32.  Payments under the ARC and PLC programs are made from the United States through FSA and the CCC provided that the recipient qualifies under the relevant regulations for participation in the program.

33.  At all relevant times, to enroll farmland in either the ARC or PLC programs, a farmer was required to truthfully complete and sign a Form CCC-861 if that person elected to participate under the 2014 Farm Bill or a Form CCC-866 if that person elected to participate under the 2018 Farm Bill.

34.  When completing and signing a Form CCC-861 or Form CCC-866 for enrollment into the ARC or PLC programs, an enrollee agreed to abide by the terms of the program contract appendices, which, for purposes of this case, are consistent under both the 2014 and 2018 Farm Bills and are collectively hereafter referred to as the "PLC/ARC Contract."

35.     The terms of the PLC/ARC Contract reflected the program eligibility regulations promulgated by the USDA for FSA benefit program eligibility and codified in Title Seven of the Code of Federal Regulations, Part 718.

36.     Like the DCP Contract, the PLC/ARC Contract stated that only a "producer" is eligible to earn any payments under these programs.  A producer, in turn, was defined as an owner, operator, landlord, tenant, or sharecropper who is both (1) entitled to share in the crop available for marketing from the farm or would have shared had the crop been produced and (2) who shares in the risk of producing the crop.  *See* 7 C.F.R. § 718.2 (defining "producer").

37.     Also like the DCP Contract, the PLC/ARC Contract further required each producer to file a farm operating plan with FSA for each crop year.  This farm operating plan was contained in a Form CCC-902 for the ARC and PLC programs.  The Form CCC-902 required the producer to list all tracts of land farmed by the producer.  The form required the producer to answer a series of questions regarding the farming operations on this land to determine whether the individual requesting benefits truly was a producer with an interest in the crop.  For example, the form required the producer to list the source(s) of capital, equipment, custom services, labor, and management used in farming the land.  When the individual requesting benefits signed a Form CCC-902 and submitted it to FSA, the individual certified the following:

> I certify that all the information entered on this document and any supporting documentation is true and correct.  I understand furnishing incorrect information will result in forfeiture of payments and may result in the assessment of a penalty.  I will timely provide written notification to the Farm

Service Agency committees for the county and State listed on this form of any changes in this farming operation.

38.     Based on these certifications, FSA provided benefit payments to producers each crop year based on their enrollment in the PLC or ARC programs.

39.     From 2014 to 2019, the PLC/ARC Contract restricted a person from receiving, directly or indirectly, PLC and ARC payments in excess of $125,000 per crop year.

40.     The PLC/ARC Contract contained the following warnings against, and penalties for, fraud.

    a.     If FSA determined that a person erroneously represented any fact affecting a determination by FSA under the program contract, that person would not be allowed benefit payments.

    b.     If FSA determined that the misrepresentation was intentional or fraudulent, or if the person knowingly adopted a scheme or device which tended to defeat the purposes of the program contract, that person would forfeit all rights to payment on each farm in which the person had an interest and would be required to refund to FSA all payments, plus interest.

    c.     Filing false documents could lead to a five-year disqualification for payments.

    d.     Any scheme or device to increase the amount of the payment under a program contract would, irrespective of whether it was related to a maximum payment limitation, be grounds for denying payment under the program contract involved or for demanding repayment if payment had already been made.

11

e.      Such fraudulent conduct could also incur liability under various criminal and civil statutes, including 31 U.S.C. § 3729 (i.e., the False Claims Act).

**B.      Defendants Devised and Employed A Scheme to Fraudulently Obtain FSA Benefit Payments Above the Maximum Payment Limits.**

41.      Defendant Gaylord Lincoln is the owner of a large farming operation, including Defendant G. Lincoln Farms, LLC, that farms thousands of acres in four counties—Calhoun, Eaton, Ingham, and Jackson—in mid-Michigan.

42.      Defendant Gaylord Lincoln took advantage of the FSA's benefit programs, including the DCP, ARC, and PLC programs, as the producer on these farms.  But because his farming operation was so large, Defendant Gaylord Lincoln hit the $40,000 maximum of FSA's DCP program benefit payments as early as 2010.

43.      Defendant Gaylord Lincoln devised a "straw lessee" scheme to get around the DCP Contract's ceiling, and later the ARC/PLC Contract's ceiling, of benefit payments per crop year.  He placed certain farmland under the names of his family members and employees.  That allowed these family members and employees to fraudulently enroll with FSA in the DCP, ARC, and PLC programs as producers to receive payments.  These individuals falsely certified their interest in the Defendants' farmland, illegally received benefit payments from FSA each crop year, and returned the ill-gotten gains to Defendants.

44.      From at least 2010 through 2019, Defendants executed this scheme, setting up straw lessee and straw farming operations under the names of family members and employees.  These included farming operations enrolled with FSA

12

under the names of Jeffrey Wilcox, John Gumbert, Charles Lowery, and Arthur Lincoln (collectively, the "Straw Farming Operators").

45.     These Straw Farming Operators collected DCP and, later, PLC and/or ARC payments from FSA for these straw farming operations.   And Defendants continued to maximize Defendant Gaylord Lincoln's own benefit payments up to or around the FSA benefit payment ceiling.

46.     More specifically, at the direction of Defendant Gaylord Lincoln, the Straw Farming Operators took out land leases on the farmland (some new and some previously leased or owned by Defendant Gaylord Lincoln), but Defendant Gaylord Lincoln provided the money for the leases.   Next, at the direction of Defendant Gaylord Lincoln, the Straw Farming Operators enrolled in the DCP, PLC, and/or ARC programs by submitting Forms CCC-509, CCC-861, and CCC-866, in which they enrolled their straw farming operations in the DCP, PLC, or ARC programs and agreed to abide by the respective program contracts.

47.     Then, at the direction of Defendant Gaylord Lincoln, the Straw Farming Operators submitted farm operation plans to FSA for the straw farming operations by completing and signing Forms CCC-502 and CCC-902.   In these forms, the Straw Farming Operators fraudulently certified to FSA that they were "producers" (i.e., that they (1) were entitled to share in any crop produced and (2) shared in the risk of producing that crop).   This was not true.   In most instances, the crops were planted, cultivated, and harvested by Defendants who alone profited from the crop production and bore all the risk of producing these crops.   In the Forms CCC-502 and CCC-902,

the Straw Farming Operators also falsely listed sources of capital, equipment, labor, and farm management in order to support their claims that they—and not Gaylord Lincoln—were the producers of these crops.  All of these records submitted to FSA by the Straw Farming Operators at the direction of Defendant Gaylord Lincoln were false and in support of the fraudulent claims for DCP, PLC, and/or ARC payments from the federal government.

48.    FSA, in reliance on the false representations and certifications made in the Forms CCC-509, CCC-861, CCC-866, CCC-502, and CCC-902 submitted by the Straw Farming Operators, made multiple DCP, PLC, and ARC payments to the Straw Farming Operators to which they were not entitled.

49.    The Straw Farming Operators then returned their ill-gotten gains to Defendants.  Sometimes the money was paid directly into "joint" bank accounts to which Defendant Gaylord Lincoln was a signatory with the Straw Farming Operator and which Defendants ultimately controlled.  In other instances, the FSA benefit payment was made directly to the Straw Farming Operator who then cut a check or endorsed the FSA check over to Defendant Gaylord Lincoln.  At other times, Defendant Gaylord Lincoln directed a Straw Farming Operator to keep the money in his own account in order to pay for the costs of maintaining the straw farming operations, such as paying for the farm leases.

50.    As described above, Defendants caused the Straw Farming Operators to submit false claims for FSA benefit payments they were not entitled to, resulting in

the FSA paying hundreds of thousands of dollars in false claims for these payments. These claims include, but are not limited to, the following:

### Example 1: Jeffrey Wilcox's FSA Benefit Payments for the 2017 Crop Year

51.     Jeffrey Wilcox ("Wilcox") was an employee of Defendants.  In or around 2005, Defendant Gaylord Lincoln directed Wilcox to negotiate farm leases under Wilcox's name.  Wilcox, a straw lessee, negotiated these leases and paid for them with money supplied by Defendant Gaylord Lincoln.

52.     Defendant Gaylord Lincoln then directed Wilcox to open a joint checking account (the "Lincoln/Wilcox Account") with Wilcox and Defendant Gaylord Lincoln as signatories.  Defendants, however, maintained control of this account and the checkbook.

53.     Defendant Gaylord Lincoln further directed Wilcox to enroll the leased farmland and crops into the FSA's benefit payment programs.  Any FSA benefit payments paid to Wilcox were placed into the Lincoln/Wilcox Account for Defendants' use.

54.     At no point did Wilcox have any share or interest in the crops.  The crops farmed on that land belonged to Defendants, who alone profited from the sales of those crops.

55.     By way of example, for the 2017 crop year, Wilcox, at the direction of Defendant Gaylord Lincoln, knowingly signed and submitted false documents to FSA. For example, Wilcox knowingly submitted false Forms CCC-861 on March 16, 2017, electing to enroll the subject crops in Calhoun County into the ARC and PLC benefit

15

programs, as well as Forms CCC-861 on June 27, 2017, electing to enroll the subject crops in Jackson County into the ARC and PLC benefit programs.  By signing these forms, Wilcox listed a 100% share of the crop, agreed to abide by the terms of the ARC/PLC Contract, and certified that all information contained in the form was true. These records were false, as it was Defendant Gaylord Lincoln who had the sole interest in the crops.

56.    Further at the direction of Defendant Gaylord Lincoln, Wilcox also submitted a knowingly false Form CCC-902 to FSA that listed multiple farms in both Calhoun and Jackson Counties that Wilcox was purportedly leasing and farming.[1]

57.    Specifically, on this Form CCC-902, Wilcox falsely certified that he was the "producer" for these farms, though, in fact, he had no risk in the production of those crops and Defendant Gaylord Lincoln bore all the financial risk.  Wilcox also falsely certified that he provided 50% of the equipment used in this farming operation, though Defendants provided all of the equipment used for the farming on that land and Wilcox did not lease any of the equipment.  Wilcox falsely certified that he provided 100% of the labor involved in the farming operation, though, in fact, Defendants paid for all of the labor.  Finally, Wilcox certified that he alone provided all of the management of the farming operations, though, in fact, Defendants made the majority, if not all, of the farm management decisions.

---

[1] FSA identifies each tract of farm land with a farm serial number and tract number by county. Wilcox listed the following tracts of land (serial number / tract number) in this CCC-902: 482/2166, 482/2167, 858/1271, 941/1325, 5952/9652, and 5952/9653 in Calhoun County, and 7663 / 11290 and 7884/11510 in Jackson County.

58.     For the 2017 crop year, Defendant Gaylord Lincoln was the only producer of the crops and farmland listed in Wilcox's Forms CCC-861 and CCC-902 fraudulently submitted by Wilcox to obtain ARC and PLC program benefit payments on behalf of Defendants.

59.     As described above, whether Wilcox was truly a producer of the enrolled crops and farmland was material to FSA's payment decision.  FSA would not have paid Wilcox if it had known that he was not the producer of those crops and that Defendant Gaylord Lincoln was the true producer.

60.     However, based on Wilcox's fraudulent enrollment into FSA's ARC and PLC programs and his false certification that he was the producer of the enrolled farms and crops, FSA paid Wilcox approximately $6,762.00 for his straw farming operations in Calhoun County and $23,827.00 for his straw farming operations in Jackson County for the 2017 crop year.  These payments were made via direct deposits on or around October 9, 2018 (Calhoun County), and October 16, 2018 (Jackson County), into the Lincoln/Wilcox Account, an account controlled by Defendants.

61.     The next month, on November 15, 2018, Defendant Gaylord Lincoln wrote himself a check for $20,500.00 out of the Lincoln/Wilcox Account.



*Gaylord Lincoln Check to Himself from Lincoln/Wilcox Account*



*Reverse of Gaylord Lincoln Check to Himself from Lincoln/Wilcox Account*

### Example 2: John Gumbert's FSA Benefit Payments for the 2017 Crop Year

62.    John Gumbert ("Gumbert") was also an employee of Defendants.  In or around 2010, Defendant Gaylord Lincoln provided Gumbert with the money to serve as a straw lessee who would lease farmland under Gumbert's name.

63.    Defendant Gaylord Lincoln directed Gumbert to enroll the leased farmland and crops into the FSA's benefit payment programs.  These FSA benefit payments were paid directly to Gumbert, who then turned over this money to Defendants or kept some of it to pay for the farmland leases.

64.     At no point did Gumbert have any share or interest in the crops.  The crops farmed on that land belonged to Defendant Gaylord Lincoln, who alone profited from the sales of those crops.

65.     By way of example, for the 2017 crop year, Gumbert, at the direction of Defendant Gaylord Lincoln, knowingly signed and submitted multiple false Forms CCC-861 to FSA on June 26, 2017, electing to enroll the subject corn and soybean crops in Jackson County into the ARC and PLC programs.  When signing these forms, Gumbert listed a 100% share in each of the crops, agreed to abide by the terms of the ARC/PLC Contract, and certified that all information contained in the forms were true.  These records were false, as it was Defendants who had the sole interest in the crops.

66.     Further at the direction of Defendant Gaylord Lincoln, Gumbert knowingly submitted a false Form CCC-902 to FSA that listed multiple farms in Jackson County that Gumbert either owned or was purportedly leasing and farming.[2] This information on the form was false.

67.     Specifically, on this Form CCC-902, Gumbert falsely certified that he was the "producer" for these farms, though, in fact, he had no risk in the production of those crops and Defendant Gaylord Lincoln bore all the financial risk.  Gumbert also falsely certified that he contributed 100% of the equipment used in this farming operation, though Defendants provided most, if not all, of the equipment used for the

---

[2] Gumbert listed the following tracts of land that he owned in Jackson County in this CCC-902: 8453/11062 and 8456/9154.  He also listed the following tracts of land that he leased in Jackson County: 5793/9701, 7253/10793, 7370/10897, 8251/3180, and 8252/10794.

farming on that land.  Gumbert falsely certified that he provided 100% of the capital for the farming operation, though, in fact, Defendant provided most, if not all, of the capital.  Gumbert falsely certified that he provided 80% of the labor involved in the farming operation, though, in fact, Defendants provided all of the labor.  Finally, Gumbert falsely certified that he alone provided all of the management of the farming operations, though, in fact, Defendants made the majority, if not all, of the farm management decisions.

68.    For the 2017 crop year, Defendant Gaylord Lincoln was the only producer of the crops and farmland listed in Gumbert's Forms CCC-861 and CCC-902 fraudulently submitted by Gumbert to obtain ARC benefit payments on behalf of Defendants.

69.    As described above, whether Gumbert was truly a producer of the enrolled crops and farmland was material to FSA's payment decision.  FSA would not have paid Gumbert if it had known that he was not the producer and that Defendant Gaylord Lincoln was the true producer.

70.    However, based on Gumbert's fraudulent enrollment into FSA's ARC benefit programs and his false certification that he was the producer of the enrolled farms, FSA paid Gumbert $11,197.00 on or about October 17, 2018, for his straw farming operations in Jackson County for the 2017 crop year.



*FSA check to Gumbert for ARC payments for 2017 crop year in Jackson County*

71.     Gumbert deposited this check into his personal banking account and later wrote a check, at Defendant Gaylord Lincoln's direction, to Gaylord Lincoln for the same amount on December 16, 2018, with the memo line: "Govt Payment."

*Gumbert December 16, 2018 check to Gaylord Lincoln*

72.     In summary, as alleged in paragraphs 41 through 71, from 2010 through 2019, Defendants knowingly caused the submission of false claims for payments from FSA benefit programs, as well as the creation and use of false records material to those false and fraudulent claims, and knowingly and improperly retained such

overpayments to which they were not entitled, including the examples provided above as well as others to be identified through discovery and proven at trial.

**C.    Defendants Fraudulently Obtained FSA Benefit Payments for Defendant Gaylord Lincoln By Violating the Benefit Program Contracts and Submitting False Records to FSA.**

73.    As discussed above, the DCP Contract and the PLC/ARC Contract prohibited any scheme or device to defeat the purposes of the contract, and the PLC/ARC Contract specifically prohibited any scheme or device to increase the amount of payment from FSA, including schemes to circumvent the maximum payment limitations.  Any such schemes were grounds for denying payment under the program contract or for demanding repayment if payment had already been made.

74.    From at least 2010 through 2019, Defendant Gaylord Lincoln continued to enroll in, and seek benefit payments from, the DCP, PLC, or ARC programs.

75.    As part of his enrollment in these programs, Defendant Gaylord Lincoln knowingly executed and submitted to FSA Forms CCC-509, CCC-861, and CCC-866 in order to obtain DCP, PLC, or ARC program payments.

76.    By signing these forms, Defendant Gaylord Lincoln (1) acknowledged receipt of, and agreed to abide by, the DCP Contract and/or PLC/ARC Contract (depending on the year); (2) agreed to comply with the terms and conditions of the program and those governing payment limitation and eligibility; and (3) certified that all information contained on those forms was true, correct, and accurate.

77.    These Forms CCC-509, CCC-861, and CCC-866 signed and submitted by Defendant Gaylord Lincoln were false.

78.    Defendant Gaylord Lincoln knew these forms were false because he was directing a scheme to defeat the purposes of the contracts and to increase the amount of payment from FSA, including exceeding the maximum payment limitation, by having the Straw Farming Operators put some of Defendant Gaylord Lincoln's crops under their names and falsely enroll with FSA.

79.    In furtherance of his attempt to obtain FSA benefit payments for himself despite violating the DCP Contract and ARC/PLC Contract by operating a scheme to fraudulently increase the FSA's maximum payment limitation, Defendant Gaylord Lincoln submitted false Forms CCC-502 and CCC-902.

80.    These Forms CCC-502 and CCC-902 required Defendant Gaylord Lincoln to disclose all farming interests, as well as his share in those farming interests.  These Forms CCC-502 and CCC-902 also required Defendant Gaylord Lincoln to certify that the information entered on those forms was true and correct and that providing false information would lead to forfeiture of any payments.

81.    Defendant Gaylord Lincoln, however, knowingly failed to disclose the entirety of his farming interests and his shares in those interests.

82.    Instead, to carry out his scheme to get around FSA's maximum payment limitation, Defendant Gaylord Lincoln knowingly signed and submitted false Forms CCC-502 and CCC-902 that failed to disclose his true interest in the farms that were leased to straw lessees, the Straw Farming Operators.

23

83.    As a result of these knowingly false claims, FSA paid Defendants hundreds of thousands of dollars to which they were not entitled.

### *Example: Gaylord Lincoln's FSA Benefit Payments for the 2017 Crop Year*

84.    By way of specific example, Defendants falsely obtained FSA benefit payments for the 2017 crop year.

85.    In 2017, Defendant Gaylord Lincoln knowingly signed and submitted multiple false Forms CCC-861 to enroll his crops in the PLC and ARC benefit payment programs, agreeing to abide by the PLC/ARC Contract and certifying to the truth of the information he was providing to FSA.   In fact, these records and certifications were false.

86.    These forms were false because Defendant Gaylord Lincoln was in violation of the PLC/ARC Contract because he was engaged in a scheme to circumvent FSA's maximum benefit payment of $125,000 through straw lessees, including by having Straw Farming Operators Wilcox and Gumbert falsely certify land in their names in order to obtain FSA benefit payments to pay back to Defendants, as described in paragraphs 41-72 above.

87.    On June 28, 2017, Defendant Gaylord Lincoln knowingly signed and submitted a false Form CCC-902 as part of his enrollment process in receiving ARC/PLC benefit payments for the 2017 crop year.  This record was also false.

88.    More specifically, on the Form CCC-902, Defendant Gaylord Lincoln was asked to list all farmland leased by him as part of his own farming operation. Despite funding the lease payments taken out by straw lessees (Wilcox and Gumbert),

24

and despite having an actual interest in that land and the crops produced on that land, Defendant Gaylord Lincoln failed to disclose that leased land as part of his own farming operation.

89.     If FSA had known that Defendant Gaylord Lincoln was engaged in a scheme to circumvent the FSA's payment limitation and if it had known that, in support of that scheme, he had submitted such false and fraudulent documents, FSA would not have paid Defendants any FSA benefit payments.

90.     As a result of Defendant Gaylord Lincoln's materially false claims, records, and certifications, the FSA made PLC and ARC program benefit payments to Defendants even though Defendant Gaylord Lincoln falsely certified his compliance with the PLC/ARC Contract but was in violation of the PLC/ARC Contract by operating a scheme to obtain more than the maximum FSA benefit payment amount by having his Straw Farming Operators, including Wilcox and Gumbert, falsely obtain this money on Defendants' behalf, as more fully alleged in paragraphs 41-72 above.  Specifically, the FSA paid Defendants $116,366.00 in PLC and ARC program benefit payments on or about October 4, 2018 (Eaton County), October 9, 2018 (Calhoun County), and October 10, 2018 (Jackson County).

91.     In summary, as alleged in paragraphs 73-90, the United States alleges that the Defendants, from 2010 through 2019, submitted or caused to be submitted false claims to FSA for benefit payments directly to Defendant Gaylord Lincoln in violation of the terms of the DCP Contract and the PLC/ARC Contract, and knowingly and improperly retained such overpayments to which they were not entitled,

including the example provided above as well as other instances to be identified through discovery and proven at trial.

### D. Federal Crop Insurance

92.    In 1938, Congress passed the Federal Crop Insurance Act ("FCIA"), Pub. L. No. 110-234, which is designed to promote the national welfare by improving the economic stability of agriculture through a sound system of multi-peril crop insurance.

93.    In 1996, USDA created the Risk Management Agency ("RMA") to manage the Federal Crop Insurance Corporation ("FCIC"), a wholly-owned government corporation that administers the federal crop insurance program.

94.    The FCIC operates through insurance companies authorized to provide federal crop insurance.  The FCIC pays these companies an administrative operating subsidy to sell and service crop insurance policies.  These insurance companies are referred to as approved insurance providers or "AIPs."

95.    The FCIC pays a premium subsidy—also known as a risk subsidy—to the AIP, on behalf of each insured farmer.  The FCIC then reimburses the AIPs in the event indemnity payments are made to the insured farmers.

96.    AIPs provide—and the Government reimburses—multi-peril crop insurance, which is designed to help farmers manage the risk of producing a crop.

97.    Multi-peril crop insurance covers crop production loss and lost revenue based on the reduction in the market price if the loss was caused by a naturally occurring event, such as excess rain, flood, or drought.  This insurance operates

through a producer certification program, requiring farmers to certify and submit truthful and complete information in their insurance applications and any loss insurance claims.

98.    While multiple AIPs provided FCIC-backed multi-peril crop insurance, each AIP insurance policy contained the same set of terms and conditions, defined by regulation in 7 C.F.R. § 457.8, that are included in policies as Common Crop Insurance Policy Basic Provisions ("Basic Provisions").

99.    As set forth in the Basic Provisions, the scope of federal crop insurance is tied to and limited by crops in which the beneficiary has a legitimate interest.

100.    More specifically, insurance coverage attaches to "basic units," which is an insurable acreage of the insured crop in the county on the date coverage begins for the crop year in which the insured—referred to as the *producer*—has a one-hundred percent crop *share* or which is owned by one person and operated by another person on a share basis.

101.    The Basic Provisions defined "share" as the producer's *insurable interest* in the insured crop as an owner, operator, or tenant.  An "insurable interest" was defined as the producer's percentage of the insured crop that is at financial risk.

102.    The Basic Provisions stated that insurance only attaches if the producer has a share in the insured crop and only to the extent of that person's share.

103.    In order to establish coverage of basic units, the Basic Provisions required the producer to submit to the AIP an intended (pre-planting) and actual (post-planting) acreage report.  The acreage report required that the producer certify

27

the amount of acreage of the crop in the county for which that producer had a share along with the producer's share in that crop.  If the producer did not have a share in the insured crop, the producer was required to submit that information on the acreage report.

104.   This information was required under the Basic Provisions because it was critical to how the FCIC-backed AIP determined basic crop unit structure and calculated whether a loss had occurred.  If a producer did not disclose all crops in which that producer has a share in that county, the producer could obtain more favorable guarantees on the crop insurance policy than the producer otherwise would be eligible for if the producer were honest.

105.   The Basic Provisions directed that, in the event of a loss, the AIP would pay an indemnity if the producer established (1) the total production or value received for the insured crop on the unit; (2) that any loss occurred during the insurance period; (3) that the loss was caused by one or more of the insured causes specified in the Basic Provisions; and (4) that the producer had complied with all provisions of the Basic Provisions.

106.   The Basic Provisions warned against concealment, misrepresentation, or fraud, which would void the entire policy and require reimbursement of all indemnities paid.

107.   More specifically, the Basic Provisions stated: "If you have falsely or fraudulently concealed the fact that you are ineligible to receive [federal crop insurance benefits] or if you or anyone assisting you has intentionally concealed or

misrepresented any material fact relating to this policy . . . [t]his policy will be voided."

108. The Basic Provisions stated that if a policy was voided, the person may be subject to remedial sanctions, must pay twenty percent of the premium the person otherwise would have been required to pay, and must reimburse all indemnities paid for the crop year in which the voidance was effective.

109. Further, the Basic Provisions warned: "If you willfully and intentionally provide false or inaccurate information to us or FCIC or you fail to comply," the FCIC may impose a civil fine for each violation.

**E.    Defendants Directed the Straw Farming Operators to Fraudulently Obtain Federal Crop Insurance and Submit Fraudulent Insurance Claims.**

110. As described above, Defendant Gaylord Lincoln directed employees and family members to conduct straw farming operations in order for Defendants to falsely obtain FSA benefit payments above the maximum payment ceilings. However, because these straw farming operations were no longer registered with FSA under Defendant Gaylord Lincoln's name but, rather, under the names of the Straw Farming Operators, Defendant Gaylord Lincoln could not obtain—for himself— federal crop insurance for the crops grown on that farmland.

111. So, from at least 2010 through 2019, Defendant Gaylord Lincoln directed the Straw Farming Operators to obtain multi-peril crop insurance through FCIC-backed AIPs. At Defendant Gaylord Lincoln's direction, these Straw Farming Operators applied for federal crop insurance under their own names. In their crop

insurance applications, acreage reports, and loss claims, the Straw Farming Operators falsely asserted that they had a 100% share in the insured crops.

112.   In fact, and as described above, the Straw Farming Operators did not have a 100% share in the insured crops because they had no financial risk in the production of that crop.  Instead, Defendants bore all the risk of the production of those crops, and Defendants alone stood to share any and all profits from the production of those crops.

113.   In order to facilitate this scheme, Defendants submitted applications to the AIPs for multi-peril crop insurance on behalf of the Straw Farming Operators for those crops the straw lessees had falsely certified to FSA were their own.

114.   Defendants handled the entire crop insurance process for the crops falsely certified under the names of the Straw Farming Operators, including by choosing the type of crop insurance coverage, submitting the applications and other required paperwork, notifying the AIP in the event of a loss claim, and meeting with the adjustors.  Defendants also paid the premiums for the insurance policies for these Straw Farming Operators, either directly or through the "joint" accounts that were actually controlled by Defendants.

115.   Further, the federal government paid the subsidy premiums to the AIP for these fraudulent crop insurance policies, which further benefited Defendants in the form of reduced premiums for crop insurance.

116.   In addition, Defendants handled almost all interactions with the crop insurance agency, Insurance Agency One, on behalf of the Straw Farming Operators,

only directing the Straw Farming Operators to sign certain records as required in order to keep control of the Defendants' interest in those crops and insurance coverage.

117.    In the event that the AIP paid an indemnity to cover a loss under a policy held by the Straw Farming Operators, this money was placed in the "joint" accounts controlled by Defendants or was paid to the Straw Farming Operators, and then the Defendants directed that this money be paid over to them or be used to fund the Defendants' straw farming operations.

118.    In this way, Defendants caused the Straw Farming Operators to submit false claims to the FCIC-backed AIPs, and the Defendants received the monies the government paid for these false claims, both through the premium subsidy payment and by the indemnities paid for any purported loss.  These claims include, but are not limited to, the following:

### *Example 1: Jeffrey Wilcox's Hudson Insurance Group Crop Insurance Policy for Calhoun County (Policy No. 26-595-1028488) for the 2016 Crop Year*

119.    In February 2015, at the direction of Defendants, Wilcox knowingly signed a false application for multi-peril crop insurance for his purported corn and soybean crops in Calhoun County with Hudson Insurance Group, an AIP (Policy No. 26-595-1028488).  That application continued over into the 2016 crop year.

120.    In June 2016, Insurance Agency One, at the direction of Defendants, submitted the required acreage report for Wilcox.  This acreage report was false.  In the acreage report, Wilcox falsely certified that he had a 100% share in the covered

crops.  In fact, Defendants, and not Wilcox, had a 100% share in the covered crops as Defendants bore the sole financial risk in producing those crops.

121.   On October 26, 2016, Wilcox, at the direction of Defendants, submitted a check to Hudson Insurance Company for the premium payment for the insurance policy on the crops in Calhoun County.  This check was paid out of the Lincoln/Wilcox Account controlled by Defendants.

122.   If the FCIC, working in and through the AIP, had known that Wilcox did not have a share in the crops, it would not have provided him with the crop insurance, would not have paid his premium subsidy, and would not have issued an indemnity payment.

123.   However, based on Wilcox's fraudulent application for crop insurance and fraudulent loss claim, the United States, through the FCIC, paid Hudson Insurance Company a subsidized premium of $2,460.00 for this crop insurance policy.

124.   Then, on April 18, 2017, Hudson Insurance Company issued Wilcox an indemnity payment on this claim for $6,242.00 based on a 100% share of the insured corn crop in Calhoun County.



*Indemnity Check Paid to Wilcox for Loss on 2016 Corn Crop in Calhoun County*

125.   Upon receipt of that check, Wilcox, at the direction of Defendants, endorsed the check over to Defendant Gaylord Lincoln.



*Reverse Side of Indemnity Check*

### Example 2: Jeffrey Wilcox's Farmers Mutual Hail of Iowa Crop Insurance Policy for Calhoun County (Policy No. 21-025-0490303-17) for the 2017 Crop Year

126.   On March 7, 2017, at the direction of Defendants, Wilcox knowingly signed an application for multi-peril crop insurance for his purported corn and soybean crops in Calhoun County for the 2017 crop year with Farmers Mutual Hail of Iowa ("Farmers Mutual Hail"), an AIP (Policy No. 21-025-0490303-17).

127.   On July 14, 2017, at the direction of Defendants, Wilcox knowingly signed and submitted the required acreage report.  This acreage report was false.  In the acreage report, Wilcox falsely certified that he had a 100% share in the covered crops.  In fact, Defendants, and not Wilcox, had a 100% share in the covered crops as Defendants bore the sole financial risk in producing those crops.

128.   On October 5, 2017, Defendants provided a notice of loss to Farmers Mutual Hail for Wilcox's soybean crop in Calhoun County.  Instead of directing the AIP to contact Wilcox, the notice directed the AIP to contact Defendant Gaylord Lincoln and provided the phone number for Lincoln Farms.  Specifically, the notice

read: "Please contact Butch at 517-206-7686. Loss on Sbeans due to drought. Please have an adjuster contact him asap."

129.    On October 25, 2017, Wilcox, at the direction of Defendants, signed a check to Farmers Mutual Hail for the premium payment for the insurance policy on the crops in Calhoun County, and Defendants mailed this check to Farmers Mutual Hail.   This check was paid out of the Lincoln/Wilcox Account controlled by Defendants.

130.    If the FCIC, working in and through the AIP, had known that Wilcox did not have a share in the crops, it would not have provided him with the crop insurance, it would not have paid his premium subsidy, and it would not have issued an indemnity payment.

131.    However, based on Wilcox's fraudulent application for crop insurance and fraudulent loss claim, the United States, through the FCIC, paid a subsidized premium of $5,719.00 for this crop insurance policy.

132.    Then, on December 1, 2017, Wilcox, at the direction of Defendants, signed a production worksheet in support of his loss claim (Claim No. 34256).  This record was false.  In the production worksheet Wilcox falsely represented a 100% share in the entire soybean crop when, in fact, Defendants, and not Wilcox, had a 100% share in the covered crops as Defendants bore the sole financial risk in producing those crops.

133.    On December 5, 2017, Farmers Mutual Hail issued Wilcox a check for an indemnity payment of $28,932.00 for the loss on the soybean crops based on his purported 100% share of the crops.



*Indemnity Check Paid to Wilcox for Loss on 2017 Soybean Crop in Calhoun County*

134.    On receipt of that check, Jeffrey Wilcox, at the direction of Defendants, signed over the check to Defendant Gaylord Lincoln.



*Reverse Side of Indemnity Check*

**Example 3: John Gumbert's Farmers Mutual Hail of Iowa Crop Insurance Policy for Jackson County (Policy No. 21-075-0490312-17) for the 2017 Crop Year**

135.    On March 7, 2017, at the direction of Defendants, Gumbert knowingly signed an application for multi-peril crop insurance for his purported corn and

soybean crops in Jackson County for the 2017 crop year with Farmers Mutual Hail (Policy No. 21-075-0490312-17).

136.   On July 14, 2017, at the direction of the Defendants, Gumbert knowingly signed and submitted the required acreage report.  This record was false. In the acreage report, Gumbert falsely certified that he had a 100% share in the covered crops.  In fact, Defendants, and not Gumbert, had a 100% share in the covered crops as Defendants bore the sole financial risk in producing those crops.

137.   On November 9, 2017, Defendants provided a notice of loss to Farmers Mutual Hail for Gumbert's corn crop in Jackson County.  Instead of directing the AIP to contact Gumbert, the notice directed the AIP to contact Gaylord Lincoln and provided the phone number for Lincoln Farms.  Specifically, the notice read: "Please contact Butch at 517-206-7686. The loss is due to a drought. Please send Lowell Graves (The adjuster) out as soon as possible. Thank you!"

138.   On October 19, 2017, Defendant Gaylord Lincoln paid the premium check for Gumbert's crop insurance policy.



*Premium Check for Gumbert's 2017 Crop Insurance Policy Paid by Gaylord Lincoln*

139. If the FCIC, working in and through the AIP, had known that Gumbert did not have a share in the crops, it would not have provided him with the crop insurance, it would not have paid his premium subsidy, and it would not have issued an indemnity payment.

140. However, based on Gumbert's fraudulent application for crop insurance and fraudulent loss claim, the United States, through the FCIC, paid a subsidized premium of $5,065.00 for this crop insurance policy.

141. Then, on December 26, 2017, Gumbert, at the direction of Defendants, knowingly signed a production worksheet in support of his loss claim (Claim No. 44975). This record was false. In the production worksheet, Gumbert falsely certified a 100% share in the corn crops covered by the crop insurance policy. In fact, Defendants, and not Gumbert, had a 100% share in the covered crops as Defendants bore the sole financial risk in producing those crops.

142. On January 3, 2018, Farmers Mutual Hail issued Gumbert an indemnity check of $17,799.00 for his corn crop loss, which Gumbert deposited into his personal bank account.



*Indemnity Check Paid to Gumbert for Loss on 2017 Corn Crop in Jackson County*

143.   On January 9, 2019, Gumbert, at the direction of Defendants, wrote Defendant Gaylord Lincoln a check for $17,799.00.



*Check Paid by Gumbert to Gaylord Lincoln*

144.   In summary, as alleged in paragraphs 110 through 143, the United States alleges that, from about 2010 through 2019, Defendants submitted or caused to be submitted false claims, and created or caused the creation of false records in support of those fraudulent claims, to FCIC-backed AIPs and, ultimately the federal government, for crop insurance, subsidy premium payments, and, in the event of a loss, indemnity payments, and knowingly and improperly retained such overpayments to which they were not entitled, including the examples provided above as well as others to be identified through discovery and proven at trial.

### F.   Defendants Falsified Gaylord Lincoln's Own Crop Insurance Records, Causing the Government to Pay Indemnities to Him on Voided Policies.

145.   By fraudulently placing Defendants' farmland and crops in the names of straw lessees, and having those Straw Farming Operators falsely certify their interest in those crops, Defendant Gaylord Lincoln falsely minimized his own

holdings and thereby submitted false insurance documents, and false and fraudulent insurance claims, for crops that remained in his name.

146.   As discussed above, the Basic Provisions for every FCIC-backed multi-peril crop insurance policy stated that if a person concealed or misrepresented any material fact relating to the policy, the policy was voided.  And if the policy is voided, the Basic Provisions required that person to pay back any indemnities paid for the crop year in which the policy was effective.  In addition to being the basis of presented false claims or false records in support of such claims, voided policies, therefore, give rise to an "obligation to pay or transmit money to the Government" within the meaning of the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(G) and 3729(b)(3).

147.   Also as discussed above, the Basic Provisions required that each producer certify the amount of acreage of the crop in the county for which that producer has a share.  This information was required under the Basic Provisions because it was critical to how the FCIC-backed AIP determined basic crop unit structure and calculated whether a loss had occurred.  If a producer did not disclose all crops in which that producer has a share in that county, the producer could obtain more favorable guarantees on the crop insurance policy than the producer otherwise would be eligible for if the producer were honest.

148.   From at least 2010 through 2019, while Defendants orchestrated their scheme of falsely putting their land under the names of the Straw Farming Operators, Defendant Gaylord Lincoln continued to seek and obtain federal crop insurance for the crops farmed on the land he kept under his own name.

149. Each year that he did so, Defendant Gaylord Lincoln submitted the required acreage report to the insurance companies as part of the process for obtaining a policy that would cover any loss. However, despite the duty to disclose all crops in each county in which he had a share, Defendant Gaylord Lincoln submitted acreage reports to the crop insurance companies that did not list his true share within each county because he did not include the farmland and crops listed under the names of the Straw Farming Operators.

150. These acreage reports were false because, as alleged above, Defendant Gaylord Lincoln had a share in the Straw Farming Operators' crops because he was the true producer of those crops.

151. By not revealing his share in the Straw Farming Operators' crops, Defendant Gaylord Lincoln concealed and misrepresented a material fact relating to those crop insurance policies that affect the basic unit structures for those crops, thus determining how large of a guarantee would be appropriate for crops in that county, whether a loss occurs, and, if so, how much of an indemnity should be paid for that insured crop.

152. Because Defendant Gaylord Lincoln concealed and misrepresented material facts related to these crop insurance policies, those policies were voided under the terms of the Basic Provisions. As such, Defendants were not entitled to those indemnity payments and were required to return any paid indemnities.

153. At no time have Defendants paid back any of the indemnity payments received under these voided policies.

### Example: Gaylord Lincoln's Crop Insurance Policy in Calhoun County (Policy # 21-025-0490335-17) for the 2017 Crop Year

154.   By way of example, Defendant Gaylord Lincoln applied for a crop insurance policy for his corn and soybean crops in Calhoun County for the 2017 crop year with Farmers Mutual Hail.

155.   As discussed above, Wilcox, one of the Straw Farming Operators, also applied for crop insurance for his corn and soybean crops in Calhoun County for the 2017 crop year.  However, as alleged above, Wilcox was not the true producer of those crops.  Instead, Defendant Gaylord Lincoln was the producer of those crops as he alone bore the financial risk in those crops.

156.   Despite having the true share in the corn and soybean crops in Calhoun County listed under Wilcox's name, Defendant Gaylord Lincoln knowingly failed to report these acres when he signed his fraudulent acreage report to Farmers Mutual Hail for his personal crop insurance policy on July 14, 2017.

157.   For example, as a Straw Farming Operator, Wilcox purported to farm and produce soybean crops on the following farm tracts in Calhoun County: 482/2166, 482/2167, 941/1325, and 946/1329.  Defendant Gaylord Lincoln, however, was the true producer of these crops and had a share in these crops, but he knowingly did not disclose his share in these crops on his own acreage report.

158.   Instead, Defendant Gaylord Lincoln knowingly concealed and misrepresented his share in those crops when he signed a false acreage report for Policy # 21-025-0490335-17 and certified: "I certify to the best of my knowledge and belief that the acreage of crops/commodities and land uses listed herein are true and

41

correct and that all required crops/commodities and land uses have been reported for the farm(s) as applicable." This acreage report and accompanying certification were false.

159.    Despite knowing that Defendant Gaylord Lincoln had knowingly misrepresented and concealed a material fact on his acreage report for Policy # 21-025-0490335-17 and, thus, that the policy was automatically voided because of his knowing misrepresentation of material facts, Defendants fraudulently submitted a number of loss claims under this policy, including Claim numbers 44948 and 34252.

160.    Based on these loss claims, Farmers Mutual Hail paid Defendant Gaylord Lincoln $46,930.00 in indemnity payments under the voided policy.

161.    Defendants did not return these falsely obtained indemnity payments paid under the voided policy.

162.    In summary, as alleged in paragraphs 145 through 161, the United States alleges that the Defendants, from about 2010 through 2019, submitted or caused to be submitted false claims to the AIPs, specifically for insurance indemnities on crops held in Defendant Gaylord Lincoln's name that were voided due to his knowing and material misrepresentations.

163.    Defendants further made, created, and used false records and statements that were material to their false claims, and knowingly and improperly retained such overpayments to which they were not entitled, including the example provided above as well as others to be identified through discovery and proven at trial, for Defendant Gaylord Lincoln's own voided crop insurance policies.

42

164.   Defendants entered into tolling agreements with the Government, tolling the limitations period and any time-based defenses from September 2, 2020, through January 1, 2022.

## COUNT I –
## PRESENTATION OF FALSE OR FRAUDULENT CLAIMS
### (False Claims Act, 31 U.S.C. § 3729(a)(1)(A))

165.   The United States realleges and incorporates by reference the allegations of all of the preceding paragraphs of the Complaint.

166.   As discussed more fully above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment to the Government.

167.   By virtue of these false or fraudulent claims, the Government suffered damages and is therefore entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus civil penalties of between $11,803 and $23,607 for each violation occurring after November 2, 2015, and between $5,000 and $11,000 for each violation occurring on or before November 2, 2015.   31 U.S.C. § 3729(a); 28 C.F.R. §§ 85.3, 85.5.

## COUNT II –
## FALSE RECORDS OR STATEMENTS
### (False Claims Act, 31 U.S.C. § 3729(a)(1)(B))

168.   The United States realleges and incorporates by reference the allegations of all of the preceding paragraphs of the Complaint.

169.   As discussed more fully above, Defendants knowingly made, used, or caused to be made or used, materially false records and statements to get false or fraudulent claims paid or approved by the Government.

170.  By virtue of these materially false records or statements, the Government suffered damages and is therefore entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus civil penalties of between $11,803 and $23,607 for each violation occurring after November 2, 2015, and between $5,000 and $11,000 for each violation occurring on or before November 2, 2015.  31 U.S.C. § 3729(a); 28 C.F.R. §§ 85.3, 85.5.

## COUNT III –
## AVOIDING OBLIGATIONS TO PAY OR
## TRANSMIT MONEY TO THE GOVERNMENT
### (False Claims Act, 31 U.S.C. § 3729(a)(1)(G))

171.  The United States realleges and incorporates by reference the allegations of all of the preceding paragraphs of the Complaint.

172.  As discussed more fully above, Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, including overpayments knowingly and improperly retained by Defendants, as well as Defendant Gaylord Lincoln's contractual obligation to repay indemnities under voided crop insurance policies.

173.  By virtue of the Defendants' knowing concealment or knowing and improper avoidance of this obligation to pay or transmit money back to the Government, the Government suffered damages and is therefore entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus civil penalties of between $11,803 and $23,607 for each violation occurring after November 2, 2015, and between $5,000 and $11,000 for each violation occurring on or before November 2, 2015.  31 U.S.C. § 3729(a); 28 C.F.R. §§ 85.3, 85.5.

## COUNT IV –
## COMMON LAW FRAUD

174.    The United States realleges and incorporates by reference the allegations of all of the preceding paragraphs of the Complaint.

175.    The Defendants engaged in a pattern and practice of making false statements and false claims to the Government, intending the Government to rely upon these statements and false claims for payment.

176.    These false statements and claims were misrepresentations of material facts.

177.    Defendants know, or should have known, that the false statements and false claims were false and fraudulent when they made and presented them.

178.    Defendants concealed material facts from the Government.

179.    Defendants made their false statements and claims and concealed material facts intending to deceive the Government into reliance upon them and into paying false and fraudulent claims.

180.    The United States relied upon Defendants' material false representations and made payments to Defendants based on those representations.

181.    As a result, the United States has been damaged in an amount to be determined at trial.

## COUNT V –
## UNJUST ENRICHMENT

182.    The United States realleges and incorporates by reference the allegations of all of the preceding paragraphs of the Complaint.

183.   Defendants falsely obtained monies from the Government to which they were not entitled.

184.   By directly or indirectly obtaining these monies to which they were not entitled, Defendants were unjustly enriched with federal monies to the detriment of the United States.

185.   Defendants have received a benefit from the United States and an inequity to the United States has resulted because they have retained the benefit.

186.   Defendants are liable to account for and pay these amounts, or the proceeds from them, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

The United States demands and prays that judgment be entered in its favor, and against Defendants, as follows:

1.     On Counts I, II, and III under the False Claims Act, for the amount of statutory treble damages, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.     On Counts IV and V, for common law fraud and unjust enrichment, for the damages sustained and/or amounts by which Defendants were unjustly enriched or by which Defendants retained illegally obtained monies, plus interest, costs, and expenses, and all such further relief as may be just and proper.

Dated:  December 28, 2021                    Respectfully submitted,

                                             ANDREW BYERLY BIRGE
                                             United States Attorney


                                             */s/ Andrew J. Hull*
                                             ANDREW J. HULL
                                             Assistant United States Attorney
                                             U.S. Attorney's Office
                                             Western District of Michigan
                                             P.O. Box 208
                                             Grand Rapids, MI 49503
                                             Tel: (616) 808-2045
                                             Email:  Andrew.Hull@usdoj.gov